**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHIP-MENDER, INC.

          Plaintiff,                                        No. C 05-3465 PJH

     v.                                                        **ORDER CONSTRUING CLAIMS**

THE SHERWIN-WILLIAMS COMPANY,

          Defendant.

_____/

      Plaintiff Chip-Mender, Inc. ("Chip-Mender"), owns two utility patents for paint applicator systems used to apply automotive touch-up paint to cover chips and scratches on the painted surface of vehicles.  The patents are U.S. Patent No. 6,254,299 B1 ("the '299 patent) and U.S. Patent No. 6,283,663 B1 ("the '663 patent"). The inventor is Timothy M. Russo, who is also the president of Chip-Mender, to whom he assigned the patents.

      Chip-Mender filed this action on August 26, 2005, alleging that defendant The Sherwin-Williams Company ("Sherwin-Williams") had infringed Chip-Mender's patents.  On May 5, 2006, pursuant to the local rules of this court, the parties filed a joint claims construction statement.  Chip-Mender has given Sherwin-Williams a broad covenant not to sue with regard to the '633 patent, and now asserts only certain claims of the '299 patent.

      On September 13, 2006, following the filing of briefs by the parties, the court heard argument regarding the construction of nine disputed terms in the claims of the '299 patent. Chip-Mender appeared by its counsel Kenneth B. Wilson and Dieter Hellmoldt, and

United States District Court

For the Northern District of California

1    Sherwin-Williams appeared by its counsel Regan J. Fay, Peter N. Larson, and Anthony T.

2    Jacono.  At the conclusion of the hearing, the court took the matter

3    under submission, and now rules as follows.

4                                        **BACKGROUND**

5         At the time the complaint was filed, Chip-Mender was in the business of selling

6    automotive touch-up pens, based on the system described in the patents-in-suit.  It had two

7    employees – Russo and his wife.  Chip-Mender ceased operations in mid-2006.

8         Russo filed the application that led to the issuance of the '299 patent, which is

9    entitled "Paint Applicator System," on November 29, 1999.  The original application

10   contained 11 claims (1 independent claim and 10 dependent claims), which were broader

11   than, but similar to, the 22 claims that ultimately issued.  In his November 29, 1999,

12   identification of prior art, Russo disclosed 10 prior art references.

13        On August 16, 2000, the PTO issued an initial Office Action in which it rejected each

14   of the original 11 claims, based on 35 U.S.C. § 103(a), on the ground that they were

15   unpatentable in light of certain prior art.  The examiner found that it would have been

16   obvious to one of ordinary skill in the art at the time the invention was made to employ the

17   same paint composition described in two of the prior art references ("Kremer in view of

18   Saad" and "in further view of Nakai").

19        On February 9, 2001, Russo submitted a written response to the August 16, 2000,

20   Office Action, and also submitted amended claims.  In the written response, Russo

21   challenged the rejection of claims 1 though 11 on the basis that both the paint composition

22   described in the Saad reference and that described in the Nakai reference contained a

23   catalyst, which, if used in the paint composition in the Paint Applicator System, would turn

24   the liquid compound into a solid material and render the applicator useless.  Russo also

25   asserted that the paint composition described in the Nakai reference contained an acid that

26   could not be used in conjunction with the automotive paint composition in the Paint

27   Applicator System without severely damaging the paint composition in the applicator and

28   the painted surface.

                                              2

United States District Court

For the Northern District of California

1    In addition, Russo amended independent claim 1 as follows.  He modified the

2    preamble, "A paint applicator system for repairing a painted body, comprising . . . ," to read,

3    "A paint applicator system for applying automotive touch-up paint to the painted surface of

4    a vehicle, comprising . . . ."  He changed "paint composition" to "automotive paint

5    composition," and changed "said paint at said nib intended to be transferred to said body"

6    to "said paint at said nib intended to be transferred to the painted surface of a vehicle."

7    Russo also added new independent claim 12, a method claim that includes the same new

8    "automotive paint" and "surface of a vehicle" limitations, plus 14 additional claims (claims

9    13-26) that depended from new independent claim 12.

10   The Examiner issued a Notice of Allowability on March 29, 2001, with an

11   amendment stating that "[c]laims 1-22 are allowed," but that the application had been

12   amended to "[c]ancel claims 23-26."  The Examiner's reason for allowance of claims 1-22

13   was that

14       the prior art of record does not render obvious the claimed device containing
         the claimed paint composition because the prior art paint compositions having
15       the viscosity adjusted via addition of a solvent as claimed include a catalyst,
         and such compositions would harden while stored in the applicator rendering
16       the applicator inoperative.

17   The prosecution history is silent with regard to the Examiner's reasons for cancelling claims

18   23-26.  Chip-Mender speculates that they were likely cancelled due to patent drafting

19   errors, as each of those claims depended from more than one claim, which violates certain

20   provisions of the Manual of Patent Examining Procedure.  Claims 12 through 22 were all

21   allowed as written with no modifications requested by the Examiner or made by Russo.

22   In 2002, Russo became aware of Sherwin-Williams' automotive touch-up pen, the

23   Dupli-Color Scratch Fix 2-in-1 Pen, while attending an automotive trade show in Las Vegas.

24   According to Chip-Mender, up until that time, Sherwin-Williams' automotive touch-up

25   products were primarily brush-and-cap based, and employed the systems of the prior art.

26   Russo subsequently advised Sherwin-Williams that he had two patents that he believed

27   covered Sherwin-Williams' products, and offered to license his patents to Sherwin-Williams,

28   but Sherwin-Williams refused.

1

**DISCUSSION**

2    A.    Legal Standard

3         Patent infringement analysis involves a two-step process.  First, the court must

4    determine as a matter of law the correct scope and meaning of disputed claim terms.

5    Second, the properly construed claims are compared to the accused device to see whether

6    the device contains all the limitations (literally or by equivalents) in the claims at issue.

7    Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996).

8         "[T]he claims of a patent define the invention to which the patentee is entitled the

9    right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert.

10   denied, 126 S.Ct. 1332 (2006).  (citation and quotation omitted); see also Renishaw PLC v.

11   Marposs Societa' per Azioni, 158 F.3d 1243, 1248 ( Fed. Cir. 1998) (claim construction

12   "begins and ends" with the actual words of the claims).  "The terms used in the claims bear

13   a 'heavy presumption' that they mean what they say and have the ordinary meaning that

14   would be attributed to those words by persons skilled in the relevant art."  Texas Digital

15   Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 ( Fed. Cir. 2002) (citations omitted).

16        "In some cases, the ordinary meaning of claim language as understood by a person

17   of skill in the art may be readily apparent even to lay judges."  Phillips, 415 F.3d at 1314. In

18   such cases, claim construction "involves little more than the application of the widely

19   accepted meaning of commonly understood words."  Id.  When, however, the court is

20   required to examine terms that have a particular meaning in a field of art, "the court looks to

21   those sources available to the public that show what a person of skill in the art would have

22   understood disputed claim language to mean."  Id. (citing Innova/Pure Water, Inc. v. Safari

23   Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  Those sources include

24   "the words of the claims themselves, the remainder of the specification, the prosecution

25   history, and extrinsic evidence concerning relevant scientific principles, the meaning of

26   technical terms, and the state of the art."  Id.

27        A patentee is presumed to have intended the ordinary meaning of a claim term in the

28   absence of an express intent to the contrary.  York Prods., Inc. v. Central Tractor Farm &

4

United States District Court

For the Northern District of California

1    Family Ctr., 99 F.3d 1568, 1572 ( Fed. Cir. 1996).  The ordinary and customary meaning of

2    a claim term is "the meaning that the term would have to a person of ordinary skill in the art

3    in question at the time of the invention."  Phillips, 415 F.3d at 1313.  The person of ordinary

4    skill in the art is "deemed to read the claim term not only in the context of the particular

5    claim . . . but in the context of the entire patent, including the specification."  Id.

6         The words in the claim may also be interpreted in light of the prosecution history, if in

7    evidence.  Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1324-25 (Fed. Cir.

8    2002) (citations omitted). "[T]he prosecution history can often inform the meaning of the

9    claim language by demonstrating how the inventor understood the invention and whether

10   the inventor limited the invention in the course of prosecution, making the claim scope

11   narrower than it would otherwise be."  Phillips, 415 F.3d at 1317.

12        Extrinsic evidence such as dictionaries also "may be considered if the court deems it

13   helpful in determining the true meaning of the language used in the patent claims," id. at

14   1318 (quotations omitted), provided the court "attach[es] the appropriate weight . . . to

15   those sources in light of the statutes and policies that inform patent law," id. at 1324.

16        Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim

17   language may the court then rely on other extrinsic evidence, such as expert declarations.

18   York Prods, 99 F.3d at 1583 ("In those cases where the public record unambiguously

19   describes the scope of the patented invention, reliance on any extrinsic evidence is

20   improper.").  Extrinsic evidence may never be relied upon to vary or contradict the clear

21   meaning of terms in the claims.  Apex, Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1371

22   (Fed. Cir. 2003).

23   B.   The '299 Patent and the Asserted Claims

24        The '299 patent discloses a paint applicator system utilizing a paint reservoir that is

25   connected to a slidable nib which permits paint to pass through the reservoir to the exterior

26   of the nib.  The '299 patent has 22 claims, of which two – claims 1 and 12 – are in

27   independent form.  Dependent claims 2 through 7 depend from independent claim 1, and

28   dependent claims 8 through 11 depend from dependent claim 7.  Dependent claims 13

through 18 depend from independent claim 12, and dependent claims 19 through 22

depend from dependent claim 18.

Chip-Mender asserts claims 2, 3, 4, 6, 7, 9, 11, 12, 13, 14, 15, 17, 18, 20, and 22

against Sherwin-Williams.  However, the disputed terms appear only in independent claims

1 and 12.  The first seven disputed terms appear in both claims 1 and 12, and the last two

disputed terms appear only in claim 12.

Claim 1 recites

A paint applicator system for applying automotive touch-up paint to the

**painted surface of a vehicle**, comprising:

a.    a housing including a passageway;

b.    a reservoir located in said housing, **said passageway**

**communicating with said reservoir**;

c.    a **nib supported by said housing**, said **nib slidably located in said**

**passageway** communicating with said reservoir, said **nib** including a portion

extending from said passageway, said housing, reservoir, and **nib** comprising

an applicator unit; and

d.    an **automotive paint composition**, said composition including a

pigment and a sufficient amount of solvent to determine the viscosity of said

paint between 25 and 115 centipoise, measured at 22 degrees Celsius, said

paint composition positioned in said reservoir to allow **flow of said paint**

**through said passageway, to said nib**, said paint at said **nib** intended to be

transferred to the **painted surface of a vehicle**.

Claim 12 recites

A paint application method of applying automotive touch-up paint, or to repair the

**painted surface on a vehicle** compromising[1];

[a]    providing a paint applicator comprising;

────────────────────────

[1] This appears to be a typo.  The word in the amended claims, which were allowed
without amendment by the Examiner, was "comprising."

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

[b]    a housing including a passageway;

[c]    a reservoir located in said housing, **said passageway communicating with said reservoir**;

[d]    **nib supported by said housing**, said **nib slidably located in said passageway** communicating with said reservoir, said **nib** including a portion extending from said passageway, said housing, reservoirs, and **nib** comprising a paint applicator;

[e]    an **automotive paint composition** placed in said paint applicator, said composition including a pigment and a sufficient amount of solvent to determine the viscosity of said paint between 25 and 115 centipoise, measured at 22 degrees Celsius, said paint composition positioned in said reservoir to allow **flow of said paint through said passageway, to said nib**, said paint at said **nib** intended to be transferred to the **painted surface of a vehicle**;

[f]    by placing said applicator on painted surface and **applying a slight pressure to force said nib upward allowing it to open and permit said paint to flow by gravity from said reservoir through said passageway to said nib and transferring to the painted surface of the vehicle**;

[g]    or by placing said applicator on painted surface and applying slight pressure to force said **nib** upward permitting paint to flow and **squeezing said housing** to increase flow of said paint from said reservoir through said passageway to said **nib** and transferring to the **painted surface of the vehicle**.

C.    The Construction of the Disputed Terms

The parties seek an order construing nine disputed terms.

1.    **painted surface of a vehicle**

The term "painted surface of a vehicle" appears in claim 1 and claim 12. In the joint claims construction statement and in the papers filed in connection with the hearing on

7

claims construction, Chip-Mender argues that "painted surface of a vehicle" means "*painted surface of an automobile*," while Sherwin-Williams asserts that "painted surface of a vehicle" means "*any vehicle surface with paint, regardless of whether the surface is metal, plastic, or otherwise, including any self-painted surface of a self-propelled land vehicle such as a car or a motorcycle.*"

Chip-Mender proposes no construction for "painted surface," presumably intending that the phrase have its ordinary meaning,[2] while Sherwin-Williams contends that "painted surface" means "any . . . surface with paint," which simply re-phrases the term "painted surface."  Sherwin-Williams adds that the "surface" can be metal, plastic, or "otherwise," while Chip-Mender does not specify the composition of the "surface."  Sherwin-Williams provides no support for its proposed limitation regarding the type of surface, simply asserting that because there are vehicles made of materials other than metal – such as the 1950s Corvettes, made of fiberglass – the correct construction must specify that the "surface" can be any material, so long as it is "painted."

Nevertheless, there appears to be no real dispute regarding the construction of "painted surface."  Moreover, the court finds nothing in the patent claims or specification which requires that the construction include a limitation as to the composition of the "surface" that is "painted."

The only real dispute reflected in the papers involves the meaning of "vehicle."  Sherwin-Williams asserts that "vehicle" is not limited to passenger cars, but also includes any "self-propelled land vehicle" that has a "surface" with paint, such as motorcycles, trucks, vans, sport utility vehicles (SUVs), farm equipment, trailers, and trains.  The court interprets this as an argument that "vehicle" not be construed as "automobile."  Although Chip-Mender argues in its moving papers that "vehicle" means "automobile," counsel for Chip-Mender stated at the hearing that he would be "happy" to construe "vehicle" as "vehicle" instead of "automobile."  Moreover, Chip-Mender asserts in its reply brief that the

_____

[2]  In its proposed construction for disputed term No. 8, below, Chip-Mender defines "painted surface" as "painted body."

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    invention of the '299 patent is not limited to application of automotive touch-up paint to

2    "passenger cars," and argues that the term "automobile" includes all modes of

3    transportation normally associated with that term, including pick-up trucks and SUVs.

4          Based on the claim language and the specification, the court finds that the term

5    "vehicle" is not a "technical term[ ] of art, and do[es] not require elaborate interpretation,"

6    see Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001), as the parties agree that "vehicle"

7    is a commonly understood word with a widely accepted meaning.  See Phillips, 415 F.3d at

8    1314.  Thus, in light of the parties' arguments, the court finds that "painted surface of a

9    vehicle" means "any vehicle surface with paint."

10          2.    **said passageway communicating with said reservoir**

11          The term "said passageway communicating with said reservoir" appears in claim 1

12   and claim 12.  Chip-Mender contends that it means "*said channel open to said reservoir.*"

13   Sherwin-Williams asserts that it means "*a passageway [28] from the reservoir [22] that*

14   *separates this fluid storage body from the nib and that allows paint to flow from the fluid*

15   *storage body to the upper part of the nib.*"

16          According to Chip-Mender, the parties originally agreed on the definition of

17   "passageway" as "channel," but Sherwin-Williams changed its proposed construction back

18   to the undefined "passageway."  In its papers, Chip-Mender asserts that it is not important

19   whether "passageway" is construed as "channel," or simply left as "passageway."  At the

20   hearing, counsel for Chip-Mender stated that "channel" and "passageway" are the same

21   term.

22          Chip-Mender bases its proposed construction of "communicating with said reservoir"

23   on the specification, including Figure 2, and on the language of claims 1 and 12.  In

24   particular, Chip-Mender argues that the "passageway" must be "open" to the "reservoir."

25   Chip-Mender asserts that the specification makes clear that the paint flows from the

26   reservoir through the passageway to the nib.  See '299 patent, col. 2, ll. 7-12.  Chip-Mender

27   also contends that extrinsic evidence also supports this construction, citing an Internet

28   dictionary definition of "passageway" as "a path or channel or duct along which something

United States District Court

For the Northern District of California

1    may pass."

2         In its opposition, Sherwin-Williams argues that the plain and ordinary meaning of

3    "passageway" does not require a structure that is always "open," and that Chip-Mender's

4    proposed construction is inconsistent with the other claim language and the specification.

5    Sherwin-Williams bases its proposed construction on the description of Figure 2.  See '299

6    patent, col. 3, ll. 48-60.  In particular, Sherwin-Williams notes that the "passageway . . .

7    permits the paint composition to flow."  Sherwin-Williams contends that because the upper

8    part of the nib is shown as residing inside the passageway, the "passageway" depicted in

9    Figure 2 is not always unobstructed and is therefore not "always open."

10        Sherwin-Williams argues that the term "said passageway communicating with said

11   reservoir" does not prohibit a flow regulator or valve in the passageway, based on the fact

12   that the claims require that the passageway include a part of the nib, and also based on the

13   specification, which depicts a passageway including a structure in the passageway that

14   would restrict flow (the nib).

15        The court finds that "said passageway communicating with said reservoir" means

16   "said channel open to said reservoir."  According to the claim language and the

17   specification, the paint flows from the reservoir to the nib through the passageway.  See

18   '299 patent, col. 5, ll. 35-37; col. 6, ll. 24-26; col. 2, ll. 7-10, 27-30.  Therefore, the

19   passageway must at some point be "open to the reservoir."  There is no requirement in the

20   patent claims and specification that the passageway be "always open," just that it be "open"

21   in the sense that "when a force is applied to the paint composition in the reservoir either by

22   gravity or by squeezing the housing," the paint "flows from the reservoir to the passageway

23   and outwardly from the housing at the nib."  Id., col. 2, ll. 7-10.

24        3.    **nib**

25        This term appears numerous times in claim 1 and claim 12.  Chip-Mender argues

26   that "nib" means "*nib*" – that the term does not require independent construction because

27   the common meaning will suffice. Sherwin-Williams argues for the common meaning of

28   "nib" – a small projecting point – but asserts that the term should be construed as "*the*

10

*fibrous or solid structure of a fluid applicator that contacts and transfers fluid to a surface.*"

Chip-Mender asserts that nib is used throughout the patent to describe the structure that seals the applicator, regulates paint flow from the applicator, and applies automotive paint composition to the painted surface of the vehicle in need of repair.  Chip-Mender contends that the language of the claims makes it clear that the "nib" cannot be porous, citing specifically to "the flow of said paint through said passageway, to said nib," which appears in both claim 1 and claim 12, see col. 5, ll. 37; col. 6, ll. 19-20; and to "applying a slight pressure to force said nib upward allowing it to open and permit said paint to flow by gravity from said reservoir through said passageway to said nib and transferring to the painted surface of the vehicle," which appears in claim 12, see col. 6, ll. 23-27.

In opposition, Sherwin-Williams asserts that Chip-Mender cannot point to any claim language in the '299 patent that excludes fibrous structures from the ordinary and customary meaning of "nib," which Sherwin-Williams notes is defined in the McGraw-Hill Dictionary of Scientific and Technical Terms as "a small projecting point."  Sherwin-Williams argues that because "nib" is not defined by its structural composition, it should be construed broadly, without any structural limitation.

Sherwin-Williams submits that the '299 patent describes "nib" as both porous and solid because it references three prior art patents, each of which discloses a pen system or device using a porous nib.  In the "Background" section, the '299 patent states that "pen nib systems" are shown in U.S. Patent Nos. 5,468,082 ("the '082 patent" – "Hori") and 4,838,723 ("the '723 patent" – "Suzuki"), and that "pen devices using nibs" are described in U.S. Patent No. 4,923,317 ("the '317 patent" – "Bishop").  Sherwin-Williams notes that the '082 patent discloses a paint maker "with a felt tip as a nib" – i.e., a fibrous nib – and also discloses a solid "nib or ball tip;" that the '723 patent discloses a nib that is both porous and fibrous; and that the '317 patent discloses a "porous plastic wear-resistant tip."

Sherwin-Williams contends that because Russo used the Hori, Suzuki, and Bishop references to describe "nib" in the '299 patent, those prior art references are intrinsic evidence.  Relying on Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364 (Fed. Cir. 2003),

11

United States District Court

For the Northern District of California

Sherwin-Williams argues that such prior art references may be of "particular value" in construing a disputed claim term because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning.

The court finds that "nib" means "nib" or "a small projecting point." The term "nib" is not explicitly defined in the claims, the specification, or the prosecution history. The nib is identified in claims 1 and 12 as an essential element of the applicator unit. '299 patent, col. 5, ll. 27-31; col. 6, ll. 8-12. The claims also describe the location of the nib – "slidably located in [the] passageway . . . [and] including a portion extending from said passageway." Id. col. 5, ll. 27-30; col. 6, ll. 8-11. In addition, the claims and specification state that the nib transfers the paint to the painted surface of the vehicle. Id., col. 5, ll. 35-39; col. 6, ll. 17-21; col. 2, ll. 25-28. Thus, in the context of the '299 patent, the nib is the structure of the applicator that contacts and transfers the paint to the surface. There is no dispute regarding the size or shape of the nib, and no dispute that the purpose of the nib is to transfer or apply paint to the painted surface of the vehicle.

Chip-Mender argues that the common meaning of "nib" applies, and that the term requires no construction. The common meanings of "nib" are "the point of a pen" and "a sharp tip or point." Webster's II New Riverside University Dictionary (1988). Sherwin-Williams asserts that a "nib" is "a small projecting point." The dictionary definition – "a sharp tip or point" – combined with the language in claims 1 and 12 – "including a portion extending from said passageway" – equates with "a small projecting point." The court concludes that both parties agree that the commonly understood meaning applies.

The primary dispute between the parties is whether the nib must be solid or whether it can also be made of a material that is porous or fibrous. The patent does not specify whether the whether the nib is solid or fibrous, and, as noted above, the claims do not define "nib." Sherwin-Williams contends that the nib can be porous or fibrous, based solely on the fact that certain prior art uses the word "nib" to refer to structures that are porous/fibrous.

The court finds, however, that the nib in the '299 patent should not be construed as

United States District Court

For the Northern District of California

1    "porous" or "fibrous," because the specification states that the nib "serves as a regulator of

2    the flow rate of paint composition." '299 patent, col. 2, ll. 10-12.  Absent a clear definition in

3    the claims, the specification is "the single best guide to the meaning of a disputed term."

4    Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  A

5    porous/fibrous nib would not be effective in regulating the flow of paint, because it would

6    have to absorb paint before it could transfer paint to effectuate the repair to the painted

7    surface.  Further support for this construction is found below, in the discussion of disputed

8    terms Nos. 7 and 8.

9         The court disagrees with Sherwin-Williams' argument that under Kumar, the Hori,

10   Suzuki, and Bishop references that disclose "pen nib systems" or "fluid pen devices" with

11   porous and/or fibrous nibs must be taken into account as evidence that Russo intended the

12   '299 patent to include a nib made of a porous/fibrous material.  In Kumar, the Federal

13   Circuit found a prior art reference cited during the prosecution history of the patent at issue

14   to be controlling, on the grounds that the applicant and the examiner considered the

15   reference to be highly pertinent, and that the reference was discussed extensively and

16   distinguished during the prosecution of the patent.  See 351 F.3d at 1368.  In the present

17   case, however, Sherwin-Williams has not demonstrated that Russo discussed the Hori,

18   Suzuki, or Bishop references extensively during the prosecution of the '299 patent or that

19   Russo embraced those references as applying specifically to the claims at issue.  The

20   prosecution history reflects only a discussion regarding whether claims 1-4, 6-9, and 11

21   were obvious in light of Kremer in view of Saad, and whether claims 5 and 10 were obvious

22   in light of Kramer in view of Saad, and further in view of Nakai.

23        4.    **nib supported by said housing**

24        The term "nib supported by said housing" appears in claim 1 and claim 12.  Chip-

25   Mender asserts that it means "*nib confined to said housing.*"  Sherwin-Williams argues that

26   it means a "*nib in contact with the housing that may or may not be confined to the housing*

27   *and/or be non-removable.*"  The parties dispute the meaning of the phrase "supported by."

28   They also dispute whether the nib is removable from the housing or not.

United States District Court

For the Northern District of California

1    Chip-Mender contends that "supported by" means "confined to," based on the

2   specification – "The nib is preferably constructed to confine the nib to the housing yet

3   permit the nib to slide or float." '299 patent, col. 2, ll. 5-7.  Chip-Mender argues that there is

4   no suggestion in the patent that the nib is removable, and asserts that the applicator would

5   not work if the nib were removed, because the paint would flow out of the reservoir and

6   through the passageway and onto the floor if the nib were not there to stop it.  Chip-Mender

7   also refers to the prosecution history, and its cancelled claim 26 ("[t]he method of using a

8   sealed paint applicator of claim 12 for the purpose of applying said paint composition of

9   claim 18 to repair the painted surface of the vehicle"), and argues that this cancelled claim

10   shows Russo's intent that the applicator be "sealed" by the nib, which is therefore not

11   removable.

12    In opposition, Sherwin-Williams asserts that Chip-Mender is attempting to alter the

13   plain meaning of a term ("supported by") through substitution of a narrower term ("confined

14   to").  Sherwin-Williams contends that the plain meaning of "nib supported by said housing"

15   does not require the nib to be "confined" by a housing, and that the term should be

16   construed as also permitting the nib to be removed from the applicator.  Sherwin-Williams

17   claims that Chip-Mender is attempting to re-write this claim term by importing a preferred

18   embodiment from the specification.

19    Sherwin-Williams notes that the '299 patent uses both "support" and "confine" to

20   describe how the nib is housed in the paint applicator.  The specification states, "A nib is

21   also found in the present invention, and is slidably supported by the housing.  The nib is

22   located in the passageway which communicates with the reservoir.  The nib is preferably

23   constructed to confine the nib to the housing yet permit the nib to slide or float." '299

24   patent, col. 2, ll. 3-7 (emphasis added).  Sherwin-Williams contends that this language

25   discloses that any and all paint applicators described in the '299 patent have a nib that is

26   "supported" by a housing, but that some of those applicators could be further enhanced –

27   i.e., "preferably constructed" – to "confine" the nib in the housing.  Sherwin-Williams claims

28   that a person skilled in the art would not view "supported" nibs as synonymous with

14

United States District Court

For the Northern District of California

1  "confined" nibs, but rather, would view "confined" nibs as a sub-set of "supported" nibs.

2  With regard to Chip-Mender's citation to the prosecution history, Sherwin-Williams

3  contends that it is impermissible to pursue a claim construction that is equivalent to a

4  cancelled claim.  Sherwin-Williams cites Schriber-Schroth Co. v. Cleveland Trust Co., 311

5  U.S. 211 (1940), for the proposition that a patentee is not "free to gain the supposed

6  advantage of the rejected claims by a construction of the allowed claims as equivalent to

7  them."  Id. at 221-22.  Sherwin-Williams asserts that "this axiom was recently reaffirmed" in

8  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314 (Fed. Cir. 2003).

9  The court finds that "nib supported by said housing" means "nib held in place by said

10  housing."  In the portion of the specification cited by the parties, the nib is first described as

11  "slidably supported by the housing" and as "located in the passage way which

12  communicates with the reservoir."  '299 patent, col. 2, ll. 3-5.  The nib is then described as

13  "preferably constructed to confine the nib to the housing yet permit the nib to slide or float."

14  Id., col. 2, ll. 5-7.  The use of the word "preferably" in this portion of the specification does

15  not necessarily identify "confined to the housing" as a preferred embodiment, while allowing

16  for alternative embodiments such as "removable from the housing."  "Preferably

17  constructed" refers not just to "confine the nib to the housing," but to the conjunctive,

18  "confine the nib to the housing yet permit the nib to slide or float."

19  Descriptions of the invention that appear in the specification section are relevant to

20  the construction of the patent.  See SciMed Life Sys., Inc. v. Advanced Cardiovascular

21  Sys., Inc., 242 F.3d 1337, 1342-43 (Fed. Cir. 2001).  Read together with the previous two

22  sentences, which describe the nib as "slidably supported by the housing" and as "located in

23  the passageway" (which passageway is located inside the housing), with no addition of the

24  word "preferably," these portions of the specification lead to the conclusion that the

25  reference in claims 1 and 12 to a "nib supported by said housing" simply means that the nib

26  is held in place by the housing.

27  Moreover, there is no indication anywhere in the claims or the specification that the

28  nib is "removable," and Sherwin-Williams has offered no compelling support for its own

United States District Court

For the Northern District of California

proposed construction of "nib supported by said housing" as meaning "nib may not be confined to the housing and/or be non-removable."  Indeed, the nib would be unable to perform the functions required of it – sealing the applicator and regulating paint flow – if it were removable.

Finally, the court is not persuaded by Chip-Mender's argument that the court should look at cancelled claim 26 as part of the prosecution history, to establish Russo's intent that the nib be confined in the housing.[3]  The prosecution history is silent with regard to the Examiner's reasons for cancelling claims 23-26, and the Federal Circuit disfavors using ambiguous comments or silence on the part of the examiner or the patentee as evidence to support any particular construction of a claim term.  See Omega Eng'g, 334 F.3d at 1323-25 (explicit statements made by patentee or examiner during patent prosecution may be used to narrow claims); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1326-27 (Fed. Cir. 2001) (refusing to rely on ambiguity surrounding examiner's silence or patentee's lack of argument during prosecution to construe claim terms).  Thus, the court does not find that the cancelled claims can serve as intrinsic evidence to support a particular construction of the disputed terms.

### 5. nib slidably located in said passageway

The term "nib slidably located in said passageway" appears in claim 1 and claim 12. Chip-Mender argues that this term means "*slideable nib located in said channel*."  Sherwin-

---

[3] On the other hand, Sherwin-Williams' argument that Chip-Mender is precluded from proposing a claim construction that is the "equivalent" of the cancelled claim is even less meritorious.  The purpose of the doctrine of "prosecution disclaimer" is to prevent a patentee from recapturing through claim interpretation meanings he disclaimed during prosecution. SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1286 (Fed. Cir.), cert. denied, 126 S.Ct. 829 (2005).  However, prosecution history "cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter."  Schwing GmbH v. Putzmeister A.G., 305 Fed. Cir. 1318, 1324 (Fed. Cir. 2002).  Moreover, the applicant's disclaimer must be clear and unambiguous.  See Omega, 334 F.3d at 1325-26.  The Supreme Court's decision in Schriber-Schroth is not to the contrary.  See 311 U.S. at 218 ("Where the patentee in the course of his application in the patent office has, by amendment, canceled or surrendered claims, those which are allowed are to be read in light of those abandoned and an abandoned claim cannot be revived and restored to the patent by reading it by construction into the claims which are allowed.").  Here, Russo did not amend, withdraw, or cancel any claims after his initial response to the Examiner's notice of claim rejections.

United States District Court

For the Northern District of California

Williams argues that it means "*a rod-shaped structure that moves longitudinally and not rotationally, which may or may not operate in conjunction with a valve and which may or may not be a unitary part.*"

Chip-Mender asserts that the term should be construed using the ordinary meaning of the words.  Chip-Mender contends that its proposed construction is consistent with the claims, the specification, and the prosecution history of the '299 patent.

Sherwin-Williams claims that Chip-Mender is attempting to narrow the scope of the claims by excluding any passageway that operates in conjunction with, or as, a valve. Sherwin-Williams contends that the claims do not *exclude* a valve in the passageway, and furthermore, that the specification shows that the nib located in the passageway operates as a "flow-restricting valve."

Sherwin-Williams also argues that figure 2 from the '299 patent is "essentially a copy" of figure 8 from U.S. Patent No. 4,812,071 ("the '071 patent" or "Batra" – a patent for a "Correction Fluid Pen," cited by Russo in the '299 patent as prior art).  He notes that the '071 patent explains that the pressing of the applicator against the page to be corrected "helps constrict any additional flow of fluid through orifice 133 to avoid the discharge of too much fluid."  Citing Kumar, 351 F.3d at 1368, Sherwin-Williams contends that the '071 patent is intrinsic evidence.  Sherwin-Williams suggests that since '071 patent specification applies to the functioning of a "valve," and since it is similar to the description of the functioning of the invention disclosed in the '299 patent, a person skilled in the art would not read the claim language to exclude a valve structure in the passageway of the '299 patent.

Sherwin-Williams also argues that "slidably located" excludes spherical nibs. Sherwin-Williams asserts that Chip-Mender's '663 patent – the continuation-in-part patent – removed the term "slidably" to broaden the claim language, added new disclosure describing a nib that may be "cylindrical, conical, spherical, or any suitable shape." Sherwin-Williams argues that the effect of this broadening only after describing a spherical nib proves that "slidably located" in the '299 patent excludes such spherical nibs.

17

United States District Court

For the Northern District of California

1    The court finds that "nib slidably located in said passageway" means "slidable nib

2    located in said channel."  "Slidably located" in the passageway means that the nib is

3    located or positioned in the passageway or channel, and that it moves, or "slides," within

4    the passageway.  The court finds no indication in the claims, the specification, or the

5    prosecution history that any meaning other than the ordinary meaning should apply.

6    Although Sherwin-Williams previously argued that a nib is "a small projecting point,"

7    it now attempts to add limitations ("rod-shaped structure that moves longitudinally and not

8    rotationally" and "which may or may not operate in conjunction with a valve," and "which

9    may or may not be a unitary part").  As discussed above, the usage of "nib" and

10   "passageway" in the claims and specification shows that those terms require no

11   construction beyond their ordinary dictionary definitions.  The specification indicates that

12   the nib operates as "a regulator of the flow rate of paint composition."  '299 patent, col. 2, ll.

13   10-12.  However, apart from Russo's mention of the '071 patent as prior art (one of three

14   "fluid pen devices using nibs"), there is no other support in the claims, the specification, or

15   the prosecution history for the addition of limitations regarding the nib operating "in

16   conjunction with a valve," or possibly being a "unitary part."

17   Finally, with regard to the '071 patent reference, the court is not persuaded by

18   Sherwin-Williams' argument.  As noted above, Kumar found a prior art reference cited

19   during the prosecution history of the patent at issue to be controlling, on the grounds that

20   the applicant and the examiner considered the reference to be highly pertinent, and that the

21   reference was discussed extensively and distinguished during the prosecution of the

22   patent.  See 351 F.3d at 1368.  As with the Hori, Suzuki, and Bishop references, there is no

23   indication in the prosecution history that Russo discussed the Batra reference extensively

24   during the prosecution of the '299 patent or that Russo embraced that reference as

25   applying specifically to the claims at issue.

26        6.    **automotive paint composition**

27   The term "automotive paint composition" appears in claim 1 and claim 12.  Chip-

28   Mender asserts that it means *paint composition made for use on automobiles.*"  Sherwin-

United States District Court

For the Northern District of California

1   Williams contends that it means "*Pigment and solvent.  The pigment of the paint*

2   *composition may be of any type sufficient to provide a coating property for repair or*

3   *damage to a painted surface.  That is to say, the pigments may provide a decorative*

4   *function to contribute to opacity, color, and gloss control.  In addition, pigments also provide*

5   *protective qualities to the final paint composition after it has hardened.  In this regard,*

6   *pigments may be of any class, including white hiding pigments, extender pigments, black*

7   *pigments, and any other color pigments known in the art.  The automotive paint*

8   *composition includes both lacquers and enamels, i.e., paint composition with a catalyst or*

9   *drying agent.*"

10      Chip-Mender argues that the term "automotive" appears throughout the claims, the

11   specification, and the file history of the '299 patent because it is part of the claimed

12   invention.  Chip-Mender complains that Sherwin-Williams' proposed construction would

13   convert the simple "automotive paint composition" of the '299 patent into essentially any

14   paint composition to be used on any surface.  Chip-Mender accuses Sherwin-Williams of

15   attempting to broaden the claims of the patent to read on a variety of prior art references,

16   such as correction fluid pens.

17      Chip-Mender asserts that the claims and specification of the '299 patent, as well as

18   the prosecution history, all require that the disclosed paint composition be made for or

19   designed for use on automobiles.  Chip-Mender argues that there is no suggestion in the

20   intrinsic evidence that the claimed paint composition be made for anything other than an

21   automobile.

22      In opposition, Sherwin-Williams argues that Russo admitted that he did not invent

23   any new paint composition, and that the paint described in the '299 patent is commercially

24   available.  Thus, Sherwin-Williams asserts, Russo's amendment of the claims (following the

25   initial rejection) by adding the terms "automotive" or "vehicle" did not distinguish over prior

26   art paint compositions.

27      Sherwin-Williams also notes that the specification of the '299 patent defines the

28   automotive paint composition generically as "pigment" and "solvent" (citing '299 patent, col.

United States District Court
For the Northern District of California

2, ll. 12-14), and also contains the following description, which Sherwin-Williams has incorporated into its proposed construction:

> The pigment of the paint composition may be of any type sufficient to provide a coating property for repair of damage to a painted surface. That is to say, the pigments may provide a decorative function to contribute opacity, color, and gloss control. In addition, pigments may also provide protective qualities to the final paint composition after it has hardened. In this regard, pigments may [be] of any class, including white hiding pigments, extender pigments, black pigments, and any other color pigments known in the art.

Id., col. 2, ll. 40-48.

Sherwin-Williams contends that although Russo argued during the prosecution that his paint composition excluded catalysts, the '299 patent discloses an "enamel" paint as an example of the claimed automotive paint composition (citing "Example 1" in the '299 patent, col. 4, ll. 41-42). Sherwin-Williams claims that enamel paints include those that harden by a catalytic reaction in which a drying agent in the paint reacts with air. Thus, Sherwin-Williams asserts, the '299 patent inherently discloses an automotive paint composition with catalysts and driers.

The court finds that "automotive paint composition" means "paint composition formulated for use on vehicles." Sherwin-Williams' proposed addition of "pigment and solvent" is unnecessary, as both claim 1 and claim 12 include the limitation "including . . . pigment and . . . solvent" immediately following the term "automotive paint composition." Thus, including "pigment and solvent" as part of the construction would be redundant.

The remainder of Sherwin-Williams' proposed construction is unnecessary. The portion of the proposed construction that is taken from the specification, col. 2, ll. 40-48, describes the decorative function and protective qualities of the pigments, and states that the pigments "may be of any class," including "any color pigments known in the art." A person skilled in the art would understand "automotive paint" to have certain decorative function and protective qualities, and to include many classes and colors.

With regard to the question whether "automotive paint" includes catalysts, the court notes that the prosecution history indicates that Russo disclaimed paint compositions

United States District Court
For the Northern District of California

1    including catalysts, and that the claims were allowed on that basis.  Prosecution History,

2    CM 00061, 00069-70.  In addition, in discussing the viscosity of paint composition, the

3    specification states in the "Preferred Embodiments" that "driers, typically used in paints,

4    hinder the free flow of paint from [the] applicator."  The reference in Example 1 to "enamel

5    paint" is not explained in the patent, and neither party provides any documentary extrinsic

6    evidence regarding the composition of "enamel paint."  It appears, however, that the device

7    described in Example 1 did not effect an acceptable repair to the chipped surface of the

8    automobile.  Thus, it is questionable whether the reference to "enamel paint" in Example 1

9    is of consequence in determining the proper construction of "automotive paint."

10       There is no indication in the claims or specification that the "automotive paint" in the

11   '299 patent is different than ordinary automotive paint, except with regard to the use of

12   paint of a particular viscosity range (not at issue in the present proceeding), as described in

13   the claims and specification.  It is not necessary for the court to construe "automotive paint"

14   as anything other than "paint composition formulated for use on vehicles."

15           7.   **flow of said paint through said passageway, to said nib**

16       The term "flow of said paint through said passageway, to said nib" appears in claim

17   1 and claim 12.  Chip-Mender argues that the term means "*flow of said paint through said*

18   *channel to, not through, said nib.*"  Sherwin-Williams asserts that it means "*flow of paint*

19   *through said passageway and to said nib.  The paint may then travel through and/or around*

20   *the nib in being transferred to the painted surface of a vehicle.*"

21       The parties do not dispute the plain meaning of "flow of said paint through," and

22   while Chip-Mender defines "passageway" as "channel," and Sherwin-Williams stays with

23   the original "passageway," the distinction between "passageway" and "channel" is not a

24   point of contention.  The only dispute is whether "flow . . . to said nib" means "flow . . . to,

25   not through" the nib, or "flow . . . to said nib [and] then . . . through and/or around the nib."

26       Chip-Mender argues that "to the nib" means exactly what it says, and that defining

27   "to the nib" as "to and/or through the nib" would be inconsistent with the claims and the

28   specification of the '299 patent, because it might suggest that the claimed "nib" could be

United States District Court

For the Northern District of California

1   porous or that paint could flow "through" it.  Chip-Mender also contends that the wording of

2   the claim elements is controlling – noting that when the patent applicant meant "through,"

3   he said "through," not "to" (e.g., specifying "through said passageway" in element (d) of

4   claims 1 and 12, rather than "to said passageway").

5          Chip-Mender asserts further that the language of element (e) of claim 12 – "allowing

6   it to open" – indicates that the nib must be non-porous, because something that is porous is

7   already "open" by definition, and need not be "opened" to allow paint to flow.  Thus, Chip-

8   Mender argues, the nib must be non-porous in order that it can be "opened" to allow the

9   paint to flow.  Accordingly, nothing can flow "through" it.  Chip-Mender asserts that the fact

10  that the nib must be able to open and must regulate paint flow is established throughout the

11  specification of the '299 patent (citing '299 patent, col. 2, ll. 8-12, a description of the nib

12  serving "as a regulator of the flow rate of paint composition").  Chip-Mender notes that the

13  phrase "to the nib" appears repeatedly in the specification, without a single suggestion that

14  what is really meant is "through the nib."

15         Finally, Chip-Mender points again to its cancelled claims 23-26, referring to the claim

16  limitations "mov[ing] said nib from closed position to open" and "method of using sealed

17  paint applicator."  Chip-Mender also contends that its related Canadian patent explains in

18  its abstract that the patent discloses "[a] paint applicator system utilizing a paint reservoir

19  which is connected to a moveable nib which permits paint to pass through the reservoir to

20  the exterior of the nib. . . . said nib serving to start and stop the flow of paint composition

21  out of the reservoir, through the output end of the passageway onto the painted body."

22         In opposition, Sherwin-Williams relies on dictionary definitions of "to" from the

23  American Heritage Dictionary – "in a direction toward; so as to approach or come near; in

24  the direction of, so as to reach or terminate in; reaching as far as; through or terminating in"

25  – and argues, based on these definitions, that the ordinary meaning of "to" does not

26  exclude "through."  Sherwin-Williams claims, for example, that driving "to" San Francisco

27  does not exclude driving "through" San Francisco.  Sherwin-Williams also argues that even

28  if "to" does not expressly include "through," as in the idiomatic phrase "rotten to the core,"

22

United States District Court

For the Northern District of California

the word "to" clearly does not exclude paint flowing "through" the nib.  Sherwin-Williams

contends that "to said nib" does not limit paint flow after the paint reaches or comes into

contact with the nib, arguing that the claim term requires only that paint flow through the

passageway and to the nib, with no limitation as to whether the paint also travels through

and/or around the nib in being transferred to the painted surface.

Sherwin-Williams argues further that "open" in claim 12 does not define "nib" as

solid, and that in any event, the term "open" can be applied to applicators with fibrous or

porous nibs.  Sherwin-Williams contends that it is the applicator that is "open" in claim 12,

not the nib, but that even if Chip-Mender is correct that a porous nib is always "open," that

would mean that a solid nib is always closed and could never be "open," and claim 12 could

never be infringed by a solid nib.

Sherwin-Williams also asserts that the descriptions in the specification of a nib that

"serves as a regulator" or that "tends to seal" are preferred embodiments that appear either

in the "Preferred Embodiments" section of the specification, or following the "preferably

constructed" language in the specification.  Sherwin-Williams claims that none of the terms

that Chip-Mender cites as support for its "solid nib" appear anywhere in the claim language

– "regulator," "tends to seal," "sealed paint applicator," or "moved said nib from closed to

open position."  Sherwin-Williams argues that all these are terms that the inventor could

have used in the claims but chose not to, and asserts that the court must construe the

claims as written, not as the patentee wishes he had written them.

Finally, Sherwin Williams argues that cancelled dependent claims 23-26 and the

Canadian patent preclude either a solid nib or a seal.  Sherwin-Williams claims that the fact

that claims 23-26 specifically claimed a seal, but did not issue because they were

cancelled, supports the proposition that Chip-Mender forever abandoned the ability to have

claims limited to just a sealed applicator.  Sherwin-Williams argues that these cancelled

claims serve to emphasize that a seal or solid nib could have been, but were not, specified

in the claims.  Sherwin-Williams claims that under either the doctrine of claim

United States District Court
For the Northern District of California

1  differentiation[4] or the common law doctrine of <u>expressio unius est exclusio alterius</u>,[5] solid or

2  sealed nibs are not specified or required in the patent.

3      The court finds that "flow of said paint through said passageway, to said nib" means

4  "flow of said paint through said channel to, not through, said nib."  The central argument

5  between the parties with regard to this claim term involves whether the paint flows

6  "through" the nib.

7      There is no support anywhere in the patent for a construction of "to the nib" as

8  meaning "through the nib."  The court notes in particular that where the patentee meant to

9  say "through" in the claims, as in "through the passageway," he said "through."  <u>See</u> '299

10  patent, col. 5, ll. 35-39; col. 6, ll. 17-20 ("flow of said paint through said passageway, to said

11  nib").  Similarly, the specification describes the paint flowing "from the reservoir to the

12  passageway and outwardly from the housing at the nib."  <u>Id.</u>, col. 2, ll. 9-10.  This indicates

13  that the paint flows from the reservoir to the passageway, then continues to the nib – i.e.,

14  through the passageway.  Once it reaches the nib, flows "outwardly" from the housing.

15      The preferred embodiment is also consistent with this construction of "to the nib."

16  "[W]hile it is of course improper to limit the claims to the particular preferred embodiments

17  described in the specification, the patentee's choice of preferred embodiments can shed

18  light on the intended scope of the claims."  <u>Astrazeneca AB v. Mut. Pharm. Co.</u>, 384 F.3d

19  1333, 1340 (Fed. Cir. 2004).  A patent applicant need not expressly state "my invention

20  does not include X" to indicate his exclusion of X from the scope of his patent.  <u>Id.</u>

21      The "Detailed Description of the Preferred Embodiments" section of the '299 patent

22  describes the operation of the paint applicator unit shown in Fig. 2 as follows:

23

24      [4]  Under the doctrine of claim differentiation, two claims of a patent are presumptively
of different scope.  <u>Kraft Foods, Inc. v. Int'l Trading Co.</u>, 203 F.3d 1362, 1366 (Fed. Cir. 2000).
25  It isn't clear (and Sherwin-Williams does not elucidate) how the doctrine of claim differentiation
applies here with regard to cancelled claims 23-26.

26      [5]  This "maxim of interpretation" holds that "to include or express one thing implies the
27  exclusion of the other, or of the alternative. . . . For example, a rule that 'each citizen is entitled
. . .' implies that noncitizens do not share in the entitlement."  Bryan A. Garner, <u>A Dictionary
28  of Modern Legal Usage</u> (Oxford, 2d ed., 2001).  Sherwin-Williams does not explain how this
maxim applies here.

United States District Court

For the Northern District of California

1
2
3
4

> A passageway 28 is included which permits the paint composition 24 to flow from reservoir 22 to chamber 30, and to a nib or stylus 32 is slidable within chamber 30 and biased downwardly by spring 34 into such a position, nib 32 tends to seal opening 20 to chamber 30.  However, when an upward force is applied to the tip of nib 32, force arrow 36, nib slides upwardly and allows paint composition 24 to flow from reservoir 22, through passageway 28 and chamber 30 and outwardly from housing 18, arrows 38 and 40.

5  This preferred embodiment describes the paint flowing down through the passageway, to

6  the nib and "outwardly" from the housing.

7       The primary dictionary definition of "to" – "in a direction toward; so as to approach or

8  come near" – is the only definition that is consistent with the intrinsic record.  While "to" has

9  literally dozens of meanings – depending on the semantic context or the syntactical

10  structure of a given phrase – when used in conjunction with a verb that expresses

11  movement or action (such as "flow"), it does not have the same meaning as "through."  The

12  word "to" when used with a verb that expresses movement (such as "flow") means "in a

13  direction toward."  See, e.g., Websters II New Riverside University Dictionary.  "Through,"

14  on the other hand, which also has dozens of meanings, generally signifies "in one side and

15  out the other side of" or "in the midst of" or "by means of."  Id.

16       8.  **applying a slight pressure to force said nib upward allowing it to open**

17          **and permit said paint to flow by gravity from said reservoir through said**

18          **passageway to said nib and transferring to the painted surface of the**

19          **vehicle**

20       This lengthy term consists of most of element (e) of claim 12.  The only portion of

21  the element that the parties do not include are the first eight words ("by placing said

22  applicator on painted surface and").  However, while there appear to be at least six words

23  or phrases for which the parties offer competing proposed constructions, all have been

24  addressed in the discussions of the previous disputed terms, with the exception of two.

25       Chip-Mender contends that this term means "*applying a slight pressure to force said*

26  *nib into the open position to regulate said paint flow by gravity from said reservoir through*

27  *said channel to, not through, said nib and transferring to the painted body of an*

28  *automobile*."  Sherwin-Williams argues that it means "*applying a slight pressure to force*

United States District Court

For the Northern District of California

*said nib upward allowing the applicator to open and permit said paint to flow by gravity from said reservoir through said passageway and to said nib.  The paint may then travel through and/or around the nib in being transferred to the painted surface of a vehicle.*"

Chip-Mender proposes a construction for six separate words or phrases, while Sherwin-Williams uses the original words for four of those words or phrases, and provides alternatives for two.  That is, Chip-Mender construes "permit said paint to flow" as "*regulate paint flow*;" construes "passageway" as "*channel*;" construes "surface" as "*body*;" and construes "vehicle" as "*automobile*," while Sherwin-Williams stays with the original words or phrases ("permit said paint to flow," "passageway," "surface," and "vehicle").  As for the other two phrases, Chip-Mender argues that "allowing it to open" means "*forcing the nib to open*," while Sherwin-Williams claims that it means "*allowing the applicator to open.*"  Also, Chip-Mender contends that "paint flow to said nib" means "*paint flow to, not through, said nib*," while Sherwin-Williams asserts that it means that the "*paint may travel through and/or around nib.*"

There appears to be no dispute that "surface" means "body."  The court has already addressed the construction of "passageway" and "painted surface of a vehicle," as well as the dispute regarding whether the paint flows "to" the nib, or flows "to and/or through" the nib.  Thus, the only disputes concern the meaning of "upward allowing it to open" and "permit said paint to flow."  The parties disagree as to whether the "it" in "allowing it to open" refers to the nib or to the applicator, and whether "permit said paint to flow" means that the nib regulates the paint flow.

With regard to whether "allowing it to open" is intended as a reference to the nib or the applicator, Chip-Mender argues that the reference is to the nib.  Chip-Mender points to the '299 patent specification, which states that the "paint flows from the reservoir to the passageway and outwardly from the housing at the nib, which serves as a regulator of the flow rate of paint composition."  '299 patent, col. 2, ll. 8-12.  Chip-Mender argues that because the specification refers to the nib as the "regulator" of the paint flow, the only possible conclusion is that the nib has an "open" position and a "closed" position.

United States District Court

For the Northern District of California

1    Chip-Mender also contends that the prosecution history shows that the nib regulates

2    paint flow, pointing to cancelled claims 23-26, which recite "to move said nib from closed

3    position," "moving said nib from closed position to open, and by squeezing said applicator

4    to increase the flow of said paint to fill a chip or scratch and repair the painted surface of a

5    vehicle;" and "[t]he method of using a sealed paint applicator of claim 12 for the purpose of

6    applying said paint composition of claim 18 to repair the painted surface of the vehicle."

7    In opposition, Sherwin-Williams argues that "allowing it to open" means "allowing the

8    applicator to open."  Sherwin-Williams refers to its discussion in the previous section on

9    "flow of said paint through said passageway to said nib," and argues that Chip-Mender is

10   improperly attempting to import limitations from the preferred embodiment.  As for Chip-

11   Mender's citation to claims 23-26, Sherwin-Williams notes that those claims, which

12   specifically recited a seal and closed/open positions, were cancelled.  Sherwin-Williams

13   also contends that Chip-Mender recognized that the '299 patent did not disclose or claim a

14   "sealed" applicator, and for that reason added that disclosure to the '663 patent, which has

15   been withdrawn from this suit.

16   The court finds that "allowing it to open" means "moving the applicator into the open

17   position."  The parties agree that the nib is a small point that projects from the end of the

18   applicator.  It is "supported by" the housing and "slidably located" in the passageway which

19   is inside the housing.  When pressure is applied and the nib is forced upward (because

20   pressure is being applied in a downward direction), what "opens" is the end of the

21   applicator, not the nib itself.  More accurately, the applicator is forced into an "open

22   position."

23   At that moment, the paint, which flows from the reservoir through the passageway –

24   either by gravity or because of a squeezing pressure on the housing – is able to continue

25   its flow to the end of the nib, which then transfers the paint to the surface of the vehicle.

26   The transfer of paint to the vehicle surface can be accomplished only when the nib is

27   moved upward because of the pressure applied to it, because the upward movement of the

28   nib creates a space between the nib and the end of the applicator, through which the paint

United States District Court

For the Northern District of California

1    can then continue its flow to the tip of the nib, which is in contact with the vehicle surface.

2         In addition, for the reasons stated above with regard to "flow of said paint through

3    said passageway, to said nib," the court does not agree that the construction should include

4    the second part of Sherwin-Williams' proposed construction – that the paint *"may then*

5    *travel through and/or around the nib in being transferred to the painted surface of a*

6    *vehicle.*"

7         9.    **squeezing said housing**

8         The term "squeezing said housing" appears only in element (f) of claim 12.  Chip-

9    Mender argues that the term means "*squeezing said housing*" – that no independent

10   construction is required.  Sherwin-Williams contends that "squeezing said housing" means

11   "*providing sufficient force by a person's hand to deform the housing and force paint out of*

12   *the applicator.*"

13        Chip-Mender argues that the meaning of the term "squeezing said housing" is clear

14   when the term is viewed in the context of the specification.  Chip-Mender notes that the

15   specification states that "[t]he housing may be formed of a flexible material such that

16   squeezing or applying pressure to the same also applies pressure to the paint composition

17   found within the reservoir" (citing '299 patent, col. 1, ll. 62 – col. 2, ll. 2).  Chip-Mender also

18   cites the description of the preferred embodiment shown in Fig. 1, (citing id., col. 3, ll. 41-46

19   and Fig. 1).  Chip-Mender asserts that even Sherwin-Williams' '548 patent uses the terms

20   "squeezing" and "housing" in the ordinary way (referring to claim 20 of that patent, "the

21   housing comprises a resilient material capable of being squeezed to apply pressure to paint

22   composition positioned in said reservoir and thereby increase a rate of flow of the paint

23   composition").

24        In opposition, Sherwin-Williams asserts that Chip-Mender does not dispute that

25   "squeezing said housing" should be construed to involve a force no greater than a person's

26   hand.  Thus, Sherwin-Williams argues, Chip-Mender essentially agrees with Sherwin-

27   Williams' proposed construction.

28        The court finds that "squeezing said housing" means "squeezing said housing."  No

**United States District Court**

For the Northern District of California

1   construction is necessary, as both sides agree that "squeezing" means "squeezing" or

2   "applying pressure."  Sherwin-Williams' proposed limitation – that the squeezing force be

3   applied by a person's hand – is unnecessary.  Moreover, there is nothing in the intrinsic

4   record that would require that "squeezing" be limited in this manner.

5        The '299 patent discloses a small paint-applicator system, designed to touch up

6   small chips or scratches on vehicles such as automobiles.  The specification describes the

7   invention as "utiliz[ing] a housing that is preferably of a size and proportion to be hand

8   held."  '299 patent, col. 1, ll. 64-65.  Despite the use of the word "preferably," there is no

9   indication anywhere in the patent that the applicator is not intended to be hand-held.

10  Nevertheless, Chip-Mender is also correct that the "squeezing by hand" limitation does not

11  appear anywhere in the patent.

12       In addition, the additional language that Sherwin-Williams proposes – *sufficient force*

13  *. . . to deform the applicator and force paint out of the applicator* – is simply a paraphrase of

14  the limitations that follow "squeezing said housing" in claim 12.  That subsection of the

15  claim states, "squeezing said housing to increase flow of said paint from said reservoir

16  through said passageway to said nib and transferring to the painted surface of the vehicle."

17  Id., col. 6, ll. 30-33.  Logically, the flow will not increase when the housing is squeezed

18  unless the squeezing "deforms" the housing.  If the housing were rigid, the "squeezing"

19  would not have the effect of "increasing the flow" of the paint or forcing the paint out of the

20  applicator.  It is unnecessary to add the additional language  proposed by Sherwin-

21  Williams, as that meaning is contained in the limitations that follow "squeezing said

22  housing" in claim 12.

23                              **CONCLUSION**

24       In accordance with the foregoing, the court construes the disputed terms as follows:

25       1.     "Painted surface of a vehicle" means "**any vehicle surface with paint**."

26       2.     "Said passageway communicating with said reservoir" means "**said channel**

27  **open to said reservoir**."

28       3.     "Nib" means "**nib**" or "**a small projecting point**."

29

United States District Court

For the Northern District of California

1      4.     "Nib supported by said housing" means "**nib held in place by said housing**."

2      5.     "Nib slidably located in said passageway" means "**slidable nib located in**

3  **said channel**."

4      6.     "Automotive paint composition" means "**paint composition formulated for**

5  **use on vehicles**."

6      7.     "Flow of said paint through said passageway, to said nib" means "**flow of**

7  **said paint through said channel to, not through, said nib**."

8      8.     "Applying a slight pressure to force said nib upward allowing it to open and

9  permit said paint to flow by gravity from said reservoir through said passageway to said nib

10  and transferring to the painted surface of the vehicle" means "**applying a slight pressure**

11  **to force said nib upward so that applicator is in an open position, to regulate said**

12  **paint flow by gravity from said reservoir through said channel to, not through, said**

13  **nib and transferring to the painted surface of a vehicle**."

14      9.     "Squeezing said housing" means "**squeezing said housing**."

15

16  **IT IS SO ORDERED.**

17  Dated: October 16, 2006

18  _____
    PHYLLIS J. HAMILTON
    United States District Judge

19

20

21

22

23

24

25

26

27

28